The CIVIC ASSOCIATION OF the DEAF OF NEW YORK CITY, INC. (also known as the New York City Civic Association of the Deaf) and Steven G. Younger, II, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Rudolph GIULIANI, as Mayor of the City of New York, Howard Safir, as Commissioner of the Fire Department of the City of New York, Carlos Cuevas, as City Clerk and Clerk of the New York City Council, Peter Vallone, as Speaker and Majority Leader of the New York City Council, Thomas Ognibene, as Minority Leader of the New York City Council, and the City of New York, Defendants.

No. 95 Civ. 8591 (RWS).

United States District Court,
S.D. New York.

Feb. 9, 1996.

Center for Constitutional Rights, New York City (Franklin Siegel, Patrick Sullivan, Barbara Olshansky, Michael Deutsch, of counsel), Center for Constitutional Rights by Michael Schwartz, New York City, Broach & Stulberg, New York City (Robert B. Stulberg, of counsel), for Plaintiffs.

Paul A. Crotty, Corporation Counsel of the City of New York, New York City (Jonathan Pines, of counsel), for Defendants.

SWEET, District Judge.

In this class action brought pursuant to the Americans With Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 *et seq.* (Supp. II 1991) and the regulations thereunder the Equal Protection Clause of the Fourteenth Amendment, the Fifth Amendment, and the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988), the plaintiffs, the Civic Association of the Deaf of New York City, Inc. ("NYCCAD") and Steven G. Younger II ("Younger") (collectively, "Plaintiffs"), seek 1) class certification; 2) a declaratory judgment; 3) a permanent injunction against Defendants Rudolph Giuliani, as Mayor of the City of New York (the "Mayor"), Howard Safir, as Commissioner of the Fire Department of the City of New York (the "Commissioner"), Carlos Cuevas, as City Clerk and Clerk of the New York City Council (the "Clerk"), Peter Vallone, as Speaker and Majority Leader of the New York City Council

(the "Speaker"), Thomas Ognibene (the "Minority Leader"), as Minority Leader of the New York City Council, and the City of New York (the "City") (collectively, the "Defendants"), to prevent them from carrying out the removal of fire alarm boxes located on the streets of the City and replacing those boxes with notification alternatives which are not accessible to the deaf and hearing-impaired, and to require them to reconnect those street alarm boxes which have been deactivated or disconnected since September 21, 1995; and 4) attorney's fees and costs connected with this motion, pursuant to 29 U.S.C. § 794a (1988), 42 U.S.C. § 1988 (1988 & Supp. V), and 42 U.S.C. § 12205 (Supp. II 1991).

For the reasons set forth herein, the class will be certified, declaratory judgment will be granted, an injunction will be entered, and attorney's fees will be awarded.

### Prior Proceedings

Plaintiffs filed their Complaint on October 10, 1995. On October 25, 1995, they brought an order to show cause seeking a temporary restraining order and a preliminary injunction. On October 25, 1995, the motion for a TRO was denied and the hearing on the preliminary injunction was consolidated with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2).

Defendants filed their Answer on November 17, 1995. The hearing on the merits was held on November 22, 1995. Post-trial submissions were accepted through December 31, 1995.

### The Parties

Younger, a thirty-year-old man who resides in Manhattan, has been totally deaf since birth. He is the vice-president of NYCCAD, a New York not-for-profit corporation with offices in Manhattan and Queens. NYCCAD, which has approximately 569 members, is the largest deaf-run organization for advocacy of deaf people in New York City. It is a local chapter of the National Association of the Deaf and the Empire State Association of the Deaf. Its members consider it a "watchdog" on city-wide issues,

problems, and needs of people who are hearing-impaired.

The City is a municipal corporation duly organized under the laws of the State of New York.

Giuliani is the Mayor of the City. He resides in and has his place of business in Manhattan. Safir is the Commissioner of the Fire Department. He conducts business in Manhattan and has offices in Brooklyn.

The New York City Council is a legislative body located in Manhattan. Cuevas is the City Clerk and Clerk of the City Council. Legislation enacted by the City Council is put into effect through his certification and publication. His principal office is in Manhattan. Vallone is the Speaker and Majority Leader of the New York City Council. Ognibene is the Minority Leader of the City Council and an official of that body.

The Mayor, the Commissioner, the Clerk, the Speaker, and the Minority Leader are sued here in their official capacities. The City, the Fire Department, and the City Council are "public entities" pursuant to 42 U.S.C. § 12131(1)(A). The Fire Department receives federal funds and is, therefore, subject to the provisions of the Rehabilitation Act.

## Facts

### I. *The Citywide Police Communications Center*

The New York City Police Department, through its Citywide Police Communications Center, commonly referred to as "911", receives more than ten million calls annually from persons dialing the number 9-1-1 on telephones. These calls include requests for police, fire, ambulance, and other forms of assistance.

When a person dials 9-1-1 on a telephone and reports a fire, the call is transmitted from the Citywide Police Communications Center within ten seconds to one of the five borough Fire Department Communications Offices. The Fire Department Communications Offices also receive telephone alarms which are dialed directly by the public, made via operator assistance, called in from other agencies, or reported directly to neighborhood firehouses.

### II. *Fire Department Street Boxes*

New York City's street alarm box system consists of approximately 16,300 alarm boxes, made up of two types. One, the Box Alarm Read-out System (the "BARS box")—an older, electromechanical pull box—is operated merely by pulling a lever. A signal is then relayed via telegraph in Morse Code directly to the Fire Department. BARS boxes do not permit voice contact. There are approximately 5,800 BARS boxes in New York City.

The second, newer type of street alarm boxes, known as Emergency Response System ("ERS") boxes, do provide voice communication with emergency services dispatchers. The ERS boxes contain two levers—one to be used in case of fire, one to hail the police—and a speaker, through which voice communication takes place.

BARS or ERS boxes are located on approximately every second block throughout the City. In addition, approximately 2,000 of the 16,300 boxes are located on highways, terminals, and bridges and inside buildings of public assembly. In the case of both the BARS boxes and the ERS boxes, the Alarm Receipt Dispatcher at the Fire Department can tell the exact location from which the alarm call originates.

The Fire Department does not respond to all calls from street alarm boxes. When a dispatcher receives a call from a BARS box, Fire Department personnel are always dispatched to the site of the alarm. However, because of the prevalence of false alarms, calls from ERS boxes are responded to only under certain circumstances, pursuant to a "fallback position" developed by the Fire Department. Between the hours of 11:00 P.M. and 8:00 A.M., all calls received from ERS boxes, even those where the caller makes no sound, receive a response from the Fire Department. At other times—the period when false alarms are reportedly most frequent—personnel are dispatched to the site of the ERS box only if the dispatcher hears some communication.

However, the Fire Department will respond to some "silent calls" between the hours of 8:00 A.M. and 11:00 P.M. To meet the needs of the hearing-impaired community, the Fire Department has developed a protocol whereby an unintelligible voice or a specific pattern of taps—two taps, a pause, and three more taps—will draw a response from the Fire Department even in the case of an otherwise silent call.

Maintenance and repair of the street alarm box system imposes a financial burden on the City, which is currently suffering tight fiscal constraints. Some of this expense has resulted from the employment of personnel devoted solely to maintaining the system. The Fire Department employs sixty technicians full time to maintain and repair street alarm boxes, at an approximate cost of $3.8 million. BARS boxes add to personnel costs. Once triggered, they are manually rewound by fire companies after each use, a process that is not always necessary but is considered to increase the integrity of the system.

The City also suffers some additional repair costs. As the system's underground cables have aged, the older of two types of cables have required increased maintenance. Moreover, there is some evidence that the BARS boxes are increasingly difficult to repair. Because no manufacturer still produces parts for these boxes, parts must now be cannibalized from BARS boxes no longer in use. Eventually—by the year 2017 at the latest by one estimate, and perhaps sooner— BARS boxes will have to be replaced by ERS boxes, at a cost estimated at $20 million.

Although the City is somewhat burdened by the costs of maintenance and repair, there is also some evidence that the street alarm box system is not in especially imminent danger of deteriorating or becoming outmoded. Estimates of outside evaluators and some fire department personnel deem the equipment as a whole to be in good condition. A July 1994 Fire Department study found that the street alarm boxes are essentially reliable. There was credible testimony that only a small fraction of the underground cable must be replaced each year.

A further drain on the Fire Department occurs as a result of the diversion of resources from necessary calls—to both fires and medical emergencies—to false alarms reported from ERS boxes. In 1993 and 1994, 26.5% and 23.8%, respectively of the initial calls received by the Fire Department to which units were dispatched were false alarms from street alarm boxes.

Nonetheless, the system frequently provides the first notification of major fires and other emergencies. In 1993 and 1994, 15,380 and 13,013 calls received from alarm boxes, respectively, provided the only alarm for a fire or other emergency. Moreover, the number of false alarms may be controllable. From 1993 to 1994, the incidence of false alarms from the street alarm box system declined by approximately fourteen percent. That decrease was achieved by hiring a part-time dispatcher to assist in screening ERS calls during peak false alarm period.

Many of the calls reported from street alarm boxes that are not false alarms are, nonetheless, redundant. In 1993, ninety-three percent of all calls initially received from street alarm boxes were false alarms, duplicated alarms received from other sources, or constituted ERS silent calls received between 8:00 A.M. and 11:00 P.M.

The Fire Department is currently implementing a program to decrease response time to and, therefore, survival rates of victims of cardiac arrest. There is also evidence that its new CPR/Certified First Responder–Defibrillation Program will be facilitated if resources are freed from the burden of responding to false alarms. Removing alarm boxes has increased the Fire Department's ability to respond to more critical medical calls. Although a Fire Department study conducted in 1993 and 1994 concluded that firefighters were available to respond to more than 90% of calls for CPR assistance, the response time often resulted in help arriving too late.

The City estimates its initial annual savings as a result of being freed from maintenance of the Alarm Box System as $4.9 million. Over ten years, the City estimates total annual capital savings, fringe benefits savings, and cost avoidance at $12.25 million.

### III. *The August Plan*

In April 1994, soon after the Commissioner took office, a committee was established to review the street alarm box network and to examine the feasibility of other sources of technology. A plan was finalized in December 1994 (the "December Plan"), calling for the removal of all currently existing street alarm boxes and the replacement of some with wireless cellular alarm boxes.

The December Plan was the subject of litigation in the Supreme Court of the State of New York, New York County. *Powis v. Giuliani*, No. 10165/95. During the pendency of that litigation, the Fire Department submitted additional reports to the City Council, refining the proposed plan: a two-volume report entitled "Amended Report to the City Council: Planned Removal of Street Alarm Boxes & Notification Alternatives," dated June 21, 1995 (the "June Plan"); and a "Modification to Planned Removal of Street Alarm Boxes & Notification Alternatives, Dated June 21, 1995," dated August 17, 1995 (the "August Modification" or the "August Plan").

The Court in *Powis* held that in developing its plan, the Fire Department had not genuinely and comprehensively evaluated the plan's potential consequences and that the plan had been hastily prepared and was arbitrary and capricious. No evidence was presented to establish that the Fire Department considered the potential impact on the hearing-impaired of the removal of street alarm boxes.

The August Plan provided for the elimination of all street alarm boxes in two phases. The first phase was designed to provide data in order to determine whether the fire alarm boxes now in use as a primary device for calling the Fire Department and other emergency services should be dismantled throughout the City. This pilot project provided for the deactivation of 4,039 alarm boxes in Manhattan, the Bronx, Brooklyn, and Queens. By October 25, 1995, the date that Plaintiffs brought their Order to Show Cause, all but a few hundred of these 4,039 alarm boxes had been removed. All had been removed by the time of the trial on the merits.

The second phase of the August Plan would remove all street alarm boxes throughout the City. The August Plan contemplates that the only notification alternative to the street alarm boxes will be the existing 911 system, to which access will be gained through public telephones. In developing the August Plan, only minimal data were collected regarding the placement of public telephones where street alarm boxes would be removed.

Public telephones will not be placed at all locations where street alarm boxes will be removed as part of the August Plan. On June 15, 1995, NYNEX informed the Fire Department that it could not comply with its requests to install public telephones at approximately 117 locations. NYNEX reported to the Fire Department that it would be unable to provide dial tones to approximately half of those locations at a reasonable cost because of lack of cable facilities or location in areas subject to low usage and high vandalism. In addition, although the Fire Department has indicated a need for cellular telephones under its plan, no provision has been made for installation of cellular phones.

The August Plan was not developed with reference to the advent of the new Enhanced 911 system, which is described below. In developing the plan, the Fire Department did not consider it a requirement that a public pay telephone exist wherever an alarm box was previously located.

On September 6, 1995, the City Council passed Local Law No. 73 of 1995, and the bill was signed by the Mayor on September 21, 1995. Local Law 73 had the force and effect of approving the August Plan.

Local Law 73 provides that through phase one—the period of deactivation of a limited number of street alarm boxes—the Fire Department is to prepare reports to the City Council. The first of these reports was submitted on November 16, 1995. Once the final report has been filed, a sixty-day period will begin during which the City Council may hold hearings or act to stop the second phase—the total removal of all street alarm boxes. Without City Council intervention, the plan will proceed.

## IV. *The Enhanced 911 System*

The Police Department is in the process of switching from its former "911" system to an "Enhanced 911 System" ("E–911"), made capable by digital technology. The system's goal is to provide automatic location and telephone number identification ("ALI/ ANI"), permitting a more efficient response to calls received, including silent calls. E–911 has also been designed to deter false alarms, since such calls will be capable of being traced.

The Fire Department itself is not responsible for E–911. Instead, the Police Department will electronically transfer information received through E–911 to the Fire Department. Plans for E–911 communication directly to the Fire Department are only in the design stage and will not display location information about callers until the installation of the Fire Department's next dispatch system.

When the E–911 system identifies the telephone number from which a call is coming, the address which will be associated with that telephone number will be drawn from a database assembled by NYNEX. That information is based on various sources. The accuracy of the database is subject to flaws, but the evidence to date has not established that these imperfections are substantial. Although there are no figures for the City, accuracy of the database in the State of New York is between eighty-seven and ninety-nine percent. Accuracy has been higher in urban areas than in rural areas. NYNEX operates an ongoing audit process, through which it periodically checks and compares its service records and the E–911 database. In some instances, information could have no relation to the telephone's location, since billing information reflects either where a telephone is or where the bill is sent. The Fire Department itself will be unable to verify the contents of the database, nor has the Fire Department determined how frequently the E–911 database will be revised. Neither a database update contract nor its terms have been concluded.

The success of the management of the database is further complicated by the fact that NYNEX is not the only provider of telephone service in the City. Most public telephones on the streets of New York City are owned by NYNEX. The rest are divided into two types: Customer Owned Coin Operated Telephones (COCOTs) and Certified Local Exchange Carriers (CLECs). CLECs, of which there are between two and four in New York, are independent telephone companies permitted to operate within NYNEX's jurisdiction. They provide their own telephone equipment and lines to that equipment. In developing the database, NYNEX has provided the CLECs with a format through which a CLEC must, by law, respond with information on the locations of its telephones. NYNEX then uses its own audit process to verify the CLEC information. NYNEX does not, however, have any responsibility to police or enforce the CLECs' provision of that information.

COCOTs provide telephone instruments to customers, but they use NYNEX or CLEC lines. COCOTs provide public telephones throughout the City. As in the case of CLECs, NYNEX is dependent on the information reported by COCOTs for information on the location of telephones, and NYNEX has no responsibility to verify that information.

The City has experienced some difficulties in implementing the E–911 system. The target date for E–911 of June 30, 1995, was amended to October 31, 1995, and then to December 18, 1995. As of December 21, 1995, E–911 was operational on Staten Island. The cut-over from 911 to E–911 proceeded on schedule and without problem. A schedule had been set for the remaining boroughs that would make the system operational citywide by January 22, 1996.

## V. *Emergency Notification Services Available to the Deaf and Hearing–Impaired*

It is estimated that over 65,000 deaf or hearing-impaired people reside in New York City. Many more visit each day for work or pleasure. Because they are unable to communicate using voice transmission over the telephone, many deaf and hearing-impaired people communicate using TDDs. TDDs are

keyboard-like devices onto which a deaf or hearing-impaired person can type his or her message. If the person at the other end has equipment capable of receiving TDD messages, those messages will be printed out. If not, then the messages will be printed out in front of a telephone operator who, in turn, will orally relay the message to a hearing person at the other end of the line. In the last twenty years, many businesses and services have established TDD access. Only a handful of public telephones are equipped with TDD technology; most are at airports and inside train stations. In addition, computer links such as electronic mail have facilitated communication among deaf people and between them and hearing people.

On March 23, 1993, this Court endorsed a consent decree entered into by the City and a class of plaintiffs who were deaf users of TDD's to bring the City's 911 telephone emergency service notification system into compliance with the ADA. Stipulation of Settlement, *Chatoff v. City of New York,* 92 Civ. 604 (RWS) (S.D.N.Y. March 23, 1993).

Since *Chatoff,* deaf people have had two means of reporting emergencies. At home, those with TDDs can call 9-1-1 for help. The Police Safety Answering Center is TDD-equipped and staffed with Police Communications Technicians (PCT's) trained in TDD communications syntax and protocol. If a 911 call originates from a TDD-user, the PCT answering the call will take all information from the caller and then immediately forward the information to the appropriate Fire Department dispatcher. The Fire Department's Bureau of Fire Communications has received equipment to enable it to receive telephone calls placed through TDD's. However, none of that equipment was in place as of November 27, 1995. Therefore, Fire Department dispatchers have been unable directly to receive calls made by persons using TDDS.

Deaf and hearing-impaired people have access to street alarm boxes as well. Because, as discussed above, the Fire Department responds to all calls from BARS boxes, deaf and hearing-impaired people can use BARS boxes in the same way as hearing people. In the case of ERS boxes, the tapping protocols developed by the Fire Department enable the deaf and hearing-impaired to use that system to call for help, even during the period of the day during which the Fire Department does not respond to silent calls.

The Police Department plans, once E-911 is fully implemented, to respond to all silent calls with a default response: sending out a police radio motor patrol to the location provided through the automatic location identification capability. In order to provide deaf and hearing-impaired callers a means of indicating their request to diverge from the default response to receive a Fire Department response instead, the Police Department intends to implement a protocol similar to the tapping protocol developed for the ERS boxes. At present, the Police Department proposes to send fire apparatus in response to "silent" callers who press a single push button on their telephones. However, there is no evidence that this protocol has been formalized, set in place, or disseminated to the deaf and hearing-impaired.

*Discussion*

**I. Relief Sought**

Plaintiffs seek three forms of relief. First, they seek a declaratory judgment that the notification alternatives to the existing street alarm box system violate the ADA, the Equal Protection Clause, and Section 1983, because public telephones are not accessible to the deaf and the hearing-impaired.

Second, Plaintiffs seek declaratory judgment that Defendants' removal of or deactivation of the emergency street alarm boxes and their replacement with notification alternatives inaccessible to the deaf likewise violates the ADA, the Rehabilitation Act, the Equal Protection Clause, and Section 1983.

Third, Plaintiffs seek to enjoin the Defendants, their employees and agents, and those acting on their behalf from carrying out any shutdown, deactivation, removal, elimination, obstruction, or interference with the existing street alarm box system, and from acting to replace the existing accessible street alarm box system with notification alternatives which are not accessible to the deaf and to reactivate those boxes which have been turned off.

In essence, Plaintiffs contend that the existing street alarm box system is accessible to deaf persons on the sidewalks, streets, highways, and public places of the City, while the notification alternative being implemented in place of the system is inaccessible to the deaf. Therefore, assert Plaintiffs, if Defendants' plan to shut down the street alarm is not enjoined and declared unlawful, Plaintiffs and members of the Class will be unable to report fires, crimes, and other life-threatening emergencies from the sidewalks, streets, highways, and other public places of the City, as they are able to do at present.

Defendants counter with two defenses: first, that the ADA does not require the replacement of disabled-accessible systems when those systems are removed; second, that if the ADA does apply where systems are removed, the advent of the E–911 system will adequately meet the needs of the deaf and hearing-impaired and bring them into compliance.

## II. *Legal Standards*
### A. *Declaratory Judgment*

Plaintiffs seek declaratory judgment as to the rights of the plaintiff class. This Court has authority to render a declaratory judgment pursuant to 28 U.S.C. § 2201(a), which states:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

■ The two criteria guiding the policy in favor of rendering declaratory judgments are (1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) whether it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding. *See Continental Casualty Co. v. Coastal Savs. Bank,* 977 F.2d 734, 737 (2d Cir.1992); *Broadview Chem. Corp. v. Loctite Corp.,* 417 F.2d 998 (2d Cir.1969),

*cert. denied,* 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970). If either prong of this test is met, the request for declaratory judgment should be entertained. *Continental,* 977 F.2d at 737; *Broadview,* 417 F.2d at 1001.

### B. *Injunctive Relief*

■ The standard for granting a preliminary injunction in this circuit is (1) a showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant. *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 135–36 (2d Cir.1992); *SEC v. Unifund Sal,* 910 F.2d 1028, 1038 n. 7 (2d Cir.1990); *Citibank, N.A. v. Nyland (CF8) Ltd.,* 839 F.2d 93, 97 (2d Cir.1988); *Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247 (2d Cir.1973).

■ The showing of irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Corp.,* 719 F.2d 42, 45 (2d Cir.1983)). Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation, a preliminary injunction will not issue. *See JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). Monetary loss will not suffice unless the movant shows damage that cannot be rectified by financial compensation. *See Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989). The law in this circuit requires a showing that irreparable damages are likely, not merely possible. *JSG Trading Corp.,* 917 F.2d at 79; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

■ The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed as to the merits. *See Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12,

94 L.Ed.2d 542 (1993); *University of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 1832, 68 L.Ed.2d 175 (1981).

### III. *The Class Will Be Certified*

### A. *The Requirements of Rule 23(a)*

Plaintiffs seek, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1) and (2), to certify a class of similarly situated individuals, consisting of persons with handicaps who are deaf or hearing-impaired and use a TDD to communicate via telephone and who reside, work, or are present in the City and use its sidewalks, streets, highways, or public places.

Rule 23(c)(1), Fed.R.Civ.P., provides: "As soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained." In applying this Rule, courts have held that class action determinations are to be based solely on the allegations set forth in the complaint, which are accepted as true, *see Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978), and not on an inquiry into the merits of the plaintiff's claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 94 (S.D.N.Y. 1981). Thus, the only question to be determined is whether the requirements of Rule 23 have been satisfied, and in making this determination, any references to Plaintiffs' factual allegations set forth below are not to be construed as findings of fact regarding the issues raised by those allegations.

■ Furthermore, our Court of Appeals has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation. *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1208–09 (2d Cir.1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298, 301 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). However, despite the liberal interpretation that this Court must give to Rule 23, it may certify this as a class action only after undertaking "rigorous analysis" to assure that the requirements of the Rule are satisfied. *General Tel. Co. of Southwest v. Falcon,* 457 U.S.

147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

Rule 23(a) provides that:

[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If these criteria are not met, an action may not be maintained as a class action. Fed. R.Civ.P., Rule 23(b). Each of these criteria is now considered in turn.

### 1. *Numerosity and Impracticability*

■ Although Rule 23(a)(1) requires that the class must be so numerous that joinder of all class members is impracticable, precise quantification of the class members is not necessary because the court may make "common sense assumptions" to support a finding of numerosity. *In re Data Access Sys. Secs. Litig.,* 103 F.R.D. 130, 137 (D.N.J. 1984), *rev'd on other grounds,* 843 F.2d 1537 (3d Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). Additionally, " 'impracticality' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964).

■ The Plaintiffs in this action do not know the precise number of members of the Class, but the Complaint alleges that the Class numbers over 65,000. These numbers are sufficient to satisfy the numerosity criterion of Rule 23 and make the joinder of all Class members impracticable. *See Korn,* 456 F.2d at 1209.

### 2. *Commonality and Predominance*

■ Rules 23(a)(2) and (3) require that, for an action to be properly maintained as a class action, there must be questions of law or fact common to the class which predomi-

nate over questions peculiar to individual members of the class. When such common questions do predominate, differences among the questions raised by individual members will not defeat commonality. *See Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y.1977), *appeal dismissed*, 574 F.2d 656 (2d Cir.1978).

■ The class claims against Defendants in this action arise out of a single set of operative facts and are based on the same legal theories. The Court finds there to be questions of law and fact which predominate over individual questions. The Plaintiffs describe a common course of conduct by the Defendants in removing the street alarm boxes and in failing to provide adequate notification alternatives.

Therefore, the questions raised by the Plaintiffs and the Class satisfy the commonality and predominance criteria of Rule 23(a)(2) and (3).

### 3. *Typicality*

■ Rule 23(a)(3) requires that the claims asserted by plaintiffs on behalf of a proposed class be typical of the claims of the other members of the class.

> Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Dura–Bilt Corp.*, 89 F.R.D. at 99; *see Green*, 406 F.2d at 299.

■ The plaintiffs in this action, like every other member of the proposed Class, are or represent deaf or hearing-impaired individuals. As a result of removal of the street alarm boxes, the members of the Class have had or will have impaired their ability to report fires from City streets.

In the matter at hand, the named Plaintiffs have satisfied the typicality criterion and have adequately alleged that the underlying facts giving rise to this action are the same for them and the Class, and that the claims of the named Plaintiffs and the Class are based on identical legal theories.

### 4. *Representation*

■ Rule 23(a)(4) requires that the plaintiffs be adequately representative of the class, and our Court of Appeals has held plaintiffs must satisfy both prongs of a two-pronged test to qualify as adequate representatives. The plaintiffs must show, first, that there is an absence of conflict and antagonistic interests between them and the class members, and second, that the plaintiffs' counsel is "qualified, experienced and capable." *Ross v. A.H. Robins Co.*, 100 F.R.D. 5, 7 (S.D.N.Y.1982); *accord In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992).

■ On the record before the Court, there is no conflict between the Plaintiffs and the members of the proposed Class. Each of the named Plaintiffs has sufficient knowledge of the action and the parties and of his or its responsibilities as a class representative, and the requisite intent to see the successful prosecution of this litigation to adequately represent the members of the Class. Plaintiffs' counsel have the requisite qualifications, experience, and abilities to prosecute this litigation in a manner consistent with the requirements imposed on counsel representing a class pursuant to Rule 23.

Therefore, the criterion of adequate representation has been satisfied by the Plaintiffs.

### B. *The Requirements of Rule 23(b)*

■ To maintain a class action, one of the alternative requirements of Rule 23(b) must be met. Here both Rule 23(b)(1) and Rule 23(b)(2) are satisfied. Rule 23(b)(1) states that a class action may be maintained if, in addition to the prerequisites of Rule 23(a):

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
>> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Were all deaf or hearing-impaired individuals to sue on their own behalf, any judgment rendered against Defendants could be inconsistent, depending on the circumstances of the individual suing. Therefore, the risk set out in subparagraph (A) clearly applies.

■ Moreover, Rule 23(b)(2) provides that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Because the proposed removal of the street alarm boxes will, as described below, require injunctive relief applicable to the class as a whole, Rule 23(b)(2) also applies to the Class.

The Class will be certified, consisting of persons with handicaps who are deaf or hearing-impaired and use a TDD to communicate via telephone and who reside, work, or are present in the City and use its sidewalks, streets, highways, or public places, and the action will proceed as a class action.

## IV. *Defendants' Plan Would Violate the Americans With Disabilities Act*

### A. *Title II of the ADA*

■ In passing the ADA in 1990, Congress found that forty-three million Americans have one or more physical or mental disability; that they are a discrete and insular minority; and that they have been subjected to purposeful unequal treatment and relegated to a status of political powerlessness "based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a). As a remedial statute, the ADA must be broadly construed to effectuate its purpose. *See Tcherepnin v. Knight,* 389 U.S. 332, 335,

88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967); *Kinney v. Yerusalim,* 812 F.Supp. 547 (E.D.Pa.1993), *aff'd,* 9 F.3d 1067 (3d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994).

■ Title II of the ADA prohibits discrimination against the disabled in public services. At the heart of that subchapter is Section 202 of the ADA, 42 U.S.C. § 12132, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." Thus, to show a violation of Title II, a plaintiff must show that (1) he is a "qualified individual with a disability"; (2) he is being excluded from participation in or being denied the benefits of some service, program, or activity by reason of his disability; and (3) the entity which provides the service, program or activity is a public entity. *See Clarkson v. Coughlin,* 898 F.Supp. 1019 (S.D.N.Y.1995) (citations omitted).

Defendants do not dispute that Younger and the class are qualified individuals pursuant to 42 U.S.C. § 12131(2). Similarly, NYC-CAD has members within this District and other parts of New York City who are "qualified individuals" pursuant to Section 12131(2). The City, the parties agree, is a public entity. At issue, then, is only whether Plaintiffs would be excluded from participation in a service, program, or activity by reason of their deafness.

■ As a threshold question, the parties disagree about the scope of the service, program or activity provided by the City. Plaintiffs would define the service narrowly as one for reporting emergencies from sidewalks, streets, highways, and other public places. In contrast, Defendants assert that the "service, program and activity" at issue is the emergency reporting system as a whole, including reporting from residences and places of work.

What constitutes a service, program or activity under the ADA and its regulations is a question of first impression. It need not be answered here, for regardless of the scope

of the service, Plaintiffs will be deprived of the ability to participate in and benefit from it. If the service is defined as the reporting of emergencies from the streets of the City, as Plaintiffs propose, the removal of street alarm boxes—leaving only public telephones, inaccessible for the most part, as a means of reporting from the street—would deprive the deaf and hearing-impaired of the ability to make such reports from the streets and to benefit from doing so. If the service is defined broadly—as the emergency reporting system as a whole—as Defendants would have it, Plaintiffs will, it is true, have some access to the system from TDD-equipped telephones at their homes or offices. Plaintiffs will not, however, be able to participate in one crucial method of availing themselves of that service—reporting from the streets. More importantly, they will be deprived of the benefit that accrues from reporting from the street: the benefit of having rescued their property or the lives of those in their families or places of work when unable to report from inside telephones. Although a minority of fires are first reported from the street, a significant number of rescues are effected as a result of street reporting. The fact that the Fire Department has placed at least some emphasis on notification alternatives available from the street suggests that they form an important component of the emergency reporting system in general.

### B. Regulations Promulgated Under the ADA

 A number of regulations promulgated under Title II of the ADA would be violated by removal of the street alarm box system given the absence of accessible notification alternatives. Pursuant to the ADA, 42 U.S.C. § 12134(a), the Attorney General is empowered to issue regulations to implement the ADA's provisions. They are codified at 28 C.F.R. ch. 1, Part 35 (the "Regulations"). These regulations "must be given legislative and hence controlling weight unless they are arbitrary, capricious, or clearly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) (citations omitted); *see Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach,* 846 F.Supp. 986, 989 n. 9 (S.D.Fla.1994). A section-by-section

analysis of the Regulations is provided in the "Preamble to Regulations on Nondiscrimination on the Basis of Disability in State and Local Government Services," published as Appendix A to the Regulations. In addition, the Justice Department has published a "Technical Assistance Manual" (the "TAM") to provide further guidance regarding the ADA's requirements.

 Under the title "General prohibitions against discrimination", the Regulations provide, *inter alia,* that a public entity shall not:

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from [an] aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; [or]

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1). Regardless of the definition of the aid, benefit, or service supplied by the City, Defendants would violate these regulations if they were to remove the street alarm boxes without replacing them with a notification alternative. Denied the ability to report fires from the street, Plaintiffs would have their participation in and benefit from both street reporting and emergency reporting as a whole limited quantitatively and qualitatively.

A second set of Regulations, set out under the title "Existing facilities", also argues in favor of an injunction against removal of street alarm without an adequate notification alternative. Those regulations provide that, in relevant part, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when

viewed in its entirety, is readily accessible to and usable by individual with disabilities...." *Id.* at § 35.150(a).

Defendants note that the regulations on existing facilities do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities...." 28 C.F.R. § 35.150(a)(1). They argue that the emergency reporting system as a whole will be accessible to the deaf and hearing-impaired and that, therefore, the street alarm boxes need not be maintained or replaced with an accessible notification alternative. Yet even viewed in its entirety, and even defined as the reporting system as a whole, the service—absent street alarm boxes or a notification alternative—would no longer be *readily accessible* to Plaintiffs as meant by the Regulations.

Defendants also note that the regulations on existing facilities do not "[r]equire a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Id.* at § 35.150(a)(3). Defendants assert that under this exception the Fire Department need not maintain its system, since it is outmoded and expensive. It is true that Defendants have demonstrated that the street alarm boxes are expensive to maintain and repair and that they force some diversion of emergency resources from areas where they could be of greater use. Nonetheless, Defendants have not demonstrated that this presents an *undue* financial or administrative burden. As Appendix A to the Regulations notes, the burden required by Section 150 is high: "Congress intended the 'undue burden' standard in title II to be significantly higher than the 'readily achievable' standard in Title III. Thus, ... the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, program, or activities of public entities in all but the most unusual cases." *Id.* at Pt. 35, App. A. The fact that Plaintiffs have maintained the street alarm boxes for decades suggests that although the burden may be high, it does not rise to the level the Depart-

ment of Justice contemplated as undue in promulgating the Regulations under the ADA.

Specific regulations have also been promulgated with regard to communications, requiring that "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." *Id.* at § 35.160(a). Clearly, removing the street alarm boxes without providing Plaintiffs with a means of reporting emergencies from the street would not constitute a means of communication as effective as that available to hearing people.

According to Defendants, these readings of the ADA statute and of Sections 130, 150, and 160 of the Regulations improperly read in a non-existent prohibition against the removal of accessible services without replacement. Removing the street alarm box system, they argue, does not require them to substitute a new, accessible system of reporting from the street, because not only the disabled will be affected by the boxes' removal. The ADA, they argue, was meant to apply to cases like *Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach*, 846 F.Supp. 986 (S.D.Fla.1994). There, individuals with disabilities and their representatives successfully sued West Palm Beach under the ADA for eliminating certain recreational programs for disabled individuals, while leaving intact those for others. The Court held that the elimination of the recreational programs would leave the plaintiff population virtually unserved, because the recreational programs meant for the general population failed to address the needs of the disabled. In contrast, according to Defendants, here the service being eliminated is not meant only for the hearing-impaired community. Everyone—not just the deaf and hearing-impaired—will lose access to street alarm boxes.

This position overlooks the fact that public telephones will remain accessible to the hearing, thus leaving them with a means of participating in and benefitting from reporting emergencies from the streets. Although street alarm boxes are accessible to the hear-

ing, they are at present the only means by which the deaf and hearing-impaired can report emergencies from the street and, therefore, they stand in the place of the recreational programs for the disabled in *Dreher Park*. In other words, were Defendants proposing to eliminate fire services in their entirety, no claim would arise under the ADA. But for as long as a service, program, or activity remains in existence, as here, the ADA, requires that it be accessible to the disabled.

## C. *Section 162*

■ Plaintiffs contend that Defendants have violated 28 C.F.R. § 35.162, one of the Regulations concerning communication, which states that "Telephone emergency services, including 911 services, shall provide direct access to individuals who use TDD's and computer modems." *Id.* at § 35.162. Section 162, however, places its emphasis on a public entity's responsibilities at the receiving point of communications, not the sending point, addressing itself only to the public entity's responsibility to individuals already in possession of TDD's and modems. The regulations speak only of a public entity's obligation to provide the capacity to receive calls from TDD callers, not an obligation to provide TDDs to hearing-impaired callers at the sending end, whether originating from private or public telephones. Thus, removing the street alarm boxes without providing a notification alternative would not violate Section 162.

"Direct access" is defined in the Technical Assistance Manual, TAM § II–7.3100, as meaning that "emergency telephone services can directly receive calls from TDD's and computer modem users without relying on outside relay services or third party services." TAM § II–7.3100. Appendix A provides that:

> Section 35.162 requires public entities to take appropriate steps, including equipping their emergency stems with modern technology, as may be necessary to promptly receive and respond to a call from TDD's and computer modems. Entities are allowed the flexibility to determine what is the appropriate technology for their particular needs.

28 C.F.R., Part 35, Appendix A (explanatory comment to § 35.162).

Defendants contend that Section 162, set against the absence of any other regulations specifically regarding emergency services, indicates that the Justice Department intended no further restrictions on a public entity's design of its emergency reporting systems. They note that the drafters of the regulations were specifically concerned with insuring that public emergency telephone services were equipped to receive TDD calls directly, and that they thus imposed these—and only these—specific requirements upon public entities providing emergency telephone services. To emphasize the specificity of the Regulations on emergency services, Defendants note that TAM II–7.3100 prohibits 911 systems from requiring TDD callers to identify themselves by pressing the TDD's space bar, thereby placing the burden of identifying TDD calls upon the 911 operator.

■ It is true that the Regulations and the interpreting materials are very detailed, but that does not establish that they were meant to be exhaustive. The regulation on telephone emergency services and the interpretations of that regulation refer to a specific concern: that reporting of emergencies by TDD users not be delayed by the need to relay information. Its inclusion cannot be read to preempt the application of the other regulations and the ADA statute to demand further requirements of telephone emergency services.

## D. *The Enhanced 911 System*

■ Defendants contend that even if the ADA does require them to provide an accessible notification alternative before removing street alarm boxes, the Enhanced 911 system will accomplish that result. They note that, like the street alarm box system, E–911 will be able to send Police and Fire Department responses to silent calls, based upon automatic location information relayed by the systems' equipment. They contend that, like the street alarm box system, the E–911 system will permit hearing-impaired callers to indicate whether they are requesting police or fire assistance. Moreover, they note, the

E–911 system will not automatically screen out silent calls, as the existing ERS street alarm box system does between the hours of 8:00 A.M. and 11:00 P.M.

Defendants are correct in asserting that E–911, if operative and effective as proposed, could meet the requirements of the ADA. To do so, it would have to provide the hearing-impaired with a means of identifying not only their location, but also the type of emergency being reported. The default response currently proposed—sending a police car to all silent calls—would cause needless delay in the case of a fire. A protocol similar to that currently used when calls are received from ERS boxes would provide a means of calling for fire assistance. It would serve to make public telephones serve a similar function to that currently served by the ERS and BARS boxes.

Several factors, however, suggest that the E–911 system does not at present provide an adequate notification alternative. First, the evidence to date has not established that E–911 is in place and effective. Moreover, assuming that the system has gone on-line as scheduled, there is no evidence that the system functions as projected to identify effectively the location of the telephone from which calls are reported.

Second, although Defendants alluded to a proposed protocol, no evidence has been offered that one has been effected. To comply with the ADA, Defendants would have to develop such a protocol and disseminate the fact of its existence to the deaf and hearing-impaired.

## V. *Defendants' Plan Would Violate the Rehabilitation Act*

■ The Rehabilitation Act provides that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794. A program or activity includes instrumentalities of local government. *Id.* at § 794(b)(1)(A).

Our Court of Appeals has held that to state a claim under the Rehabilitation Act, plaintiffs must establish that: (1) they are "handicapped persons" under the Rehabilitation Act; (2) they are "otherwise qualified" to participate in the offered activity or program or to enjoy the services or benefits offered; (3) they are being excluded from participation or enjoyment solely by reason of their disability; and (4) the entity denying plaintiffs participation or enjoyment receives federal financial assistance. *See Rothschild v. Grottenthaler,* 907 F.2d 286, 289–90 (2d Cir. 1990); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1036 (S.D.N.Y.1995). Only the third of these criteria is in dispute.

As discussed above in the context of the ADA, Plaintiffs would be excluded from participation in and denied the benefit of reporting fires from the street if street alarm boxes were removed and no notification alternative put in place. Also for the same reasons, Defendants' objections are unavailing. The Rehabilitation Act would be violated by removal of the street alarm boxes without provision of an accessible notification alternative.

## VI. *Defendants Have Not Violated the Equal Protection Clause or Section 1983*

■ Plaintiffs contend that Defendants have violated their rights to equal protection under the law. "Most authorities have not considered disability to be a suspect or quasi-suspect classification" entitled to heightened scrutiny under an Equal Protection Analysis. *Story v. Green,* 978 F.2d 60, 64 (2d Cir.1992) (equal protection claim asserted by disabled veterans). Thus, the Fire Department's de-activation plan need merely withstand a "rational basis" review. The plan survives such an analysis.

The Department has set forth numerous reasons for embarking upon de-activation of street alarm boxes. The system may soon be redundant of the 911 and E–911 systems. It is responsible for a disproportionate number of false alarms resulting in a diversion of essential equipment and personnel from fire-prevention duties and cardiac-arrest duties. The BARS boxes may soon be obsolete and, after in-house sources of parts are depleted,

they will be incapable of repair. Labor and maintenance costs are at least somewhat burdensome.

For these reasons, Defendants have demonstrated a rational basis for removing the street alarm boxes, and they have not, therefore, violated Plaintiffs' rights to equal protection.

### VII. *Attorney's Fees Will Be Awarded*

The ADA, 42 U.S.C. § 12205, the Rehabilitation Act, 29 U.S.C. § 794a(b), permit a court, in its discretion, to award attorney's fees to a prevailing party. Plaintiffs having prevailed here, they will be awarded attorney's fees.

### *Conclusion*

For the reasons set forth above, a class is hereby certified consisting of persons who are deaf and hearing-impaired and who use a TDD to communicate via telephone and who reside, work, or are present in the City and use the sidewalks, streets, highways, or public places of the City.

For the reasons set forth above, and because a declaratory judgment will serve a useful purpose in clarifying the legal relations here in issue and will terminate and afford relief from uncertainty, a declaratory judgment is rendered that Defendants' removal of or deactivation of the emergency street alarm boxes and their replacement with notification alternatives inaccessible to the deaf would violate the ADA and the Rehabilitation Act. A second declaratory judgment is rendered that the current notification alternatives to the existing street alarm box system violate the ADA, because public telephones do not enable the deaf and hearing-impaired to request fire assistance directly from the street.

For the reasons set forth above, and because Plaintiffs have made demonstrated the potential for irreparable injury and have succeeded on the merits, Defendants, their employees, agents, and those acting on their behalf are enjoined from carrying out any shutdown, deactivation, removal, elimination, obstruction, or interference with the existing street alarm box system, and from acting to replace the existing accessible street alarm box system with notification alternatives which are not accessible to the deaf. Defendants may apply at any time to dissolve or modify the injunction by demonstrating that an accessible notification alternative exists. Among the means by which Defendants can meet this burden will be by demonstrating that E–911 is in operation and effective throughout the City and that a protocol has been developed providing the deaf and hearing-impaired with the ability to report a fire.

Because of the burden on Defendants of restoring the boxes that have been removed, because of the strong possibility that an accessible notification alternative will be developed soon, and because the pilot study begun by Defendants should be allowed to continue, Defendants will not be enjoined to reactivate those boxes which have been turned off as part of the first phase of the August Plan. If, within one year of judgment, Defendants have not successfully dissolved or modified the existing injunction by making the showing described above, a further application may be made.

Plaintiffs are awarded costs and reasonable attorney's fees.

Submit judgment on notice.

It is so ordered.